UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ROBERT HENDERSON,                    :

               Plaintiff,       :      07 Civ. 10564 (RMB)(HBP)

   -against-                         :      OPINION AND
                              ORDER
MICHAEL J. ASTRUE,                   :
Commissioner of Social Security,
                              :

              Defendant.       :
----------------------------------X


      PITMAN, United States Magistrate Judge:


I.  Introduction

        Plaintiff, Robert Henderson, brings this action pursu-
ant to Section 205(g) of the Social Security Act, 42 U.S.C. §
405(g), seeking judicial review of a final decision of the
Commissioner of Social Security ("Commissioner") denying his
application for Supplemental Security Insurance ("SSI") and
Disability Insurance Benefits ("DIB").  The plaintiff has moved
for judgment on the pleadings pursuant to Rule 12(c) of the
Federal Rules of Civil Procedure (Docket Item 12).  The Commis-
sioner moves to remand this action in order to further develop
the administrative record (Docket Item 16).  For the reasons set
forth below, plaintiff's motion is denied and the Commissioner's
motion to remand is granted.

II.  <u>Background</u>

    A.  <u>Procedural Background</u>

         Plaintiff filed an application for SSI and DIB on March
17, 2005 alleging that he had been disabled since March 9, 2005
due to a broken left ankle (Tr.[1] 61-65, 67-68, 70-71).  The
Social Security Administration denied plaintiff's application for
benefits on June 7, 2005, finding that plaintiff's condition was
not expected to remain severe enough for twelve consecutive
months to prevent him from working (Tr. 50).  After his initial
application, plaintiff claimed that he subsequently broke his
right ankle, dislocated his left[2] elbow, suffered a laceration to
his head, and was stabbed in his back (Tr. 96, 98, 194-195, 197).
Plaintiff timely requested (Tr. 43) and was granted a hearing
before an Administrative Law Judge ("ALJ") (Tr. 25-42).

         The ALJ, Terence Farrell, conducted a video hearing on
May 3, 2007 at which plaintiff appeared <u>pro se</u> (Tr. 180-204).  In
a decision dated May 25, 2007, the ALJ found that plaintiff had

---

         [1]"Tr." refers to the administrative record that defendant
filed as part of his answer, as required by 42 U.S.C. § 405(g).

         [2]In his "Disability Report - Appeal" form, plaintiff
reported that he dislocated his right elbow, but at all other
times in the record he described a dislocated left elbow.
Relevant medical records confirm that it was, in fact, his left
elbow which was injured (Tr. 167-72, 175, 194).

not been under a disability within the meaning of the Social Security Act from March 9, 2005 through the date of the decision (Tr. 13-24).  The ALJ's determination became the final decision of the Commissioner on August 23, 2007, when the Appeals Council denied plaintiff's request for review (Tr. 9-11).  On that date, the Appeals Council also noted that it had received additional evidence which it had made part of the record, including treatment records from The Kingston Hospital (Tr. 12, 160-78).  On October 14, 2007, plaintiff requested an extension of time for filing a Notice of Claim in civil court regarding the Commissioner's decision (Tr. 6-8).  The Appeals Council granted this request (Tr. 3).

Plaintiff commenced the present action on November 26, 2007 (Complaint, dated November 26, 2007 (Docket Item 2), ("Compl.") at 1).  He alleged in his complaint that he was disabled "due to receiving a broken left ankle, a broken right ankle and a dislocated left elbow, a stab wound to the lower right portion of the back and a laceration to the back of the head that required several staples, all within a six month time frame" (Compl. ¶ 4).  Plaintiff requests that "this court should reverse the decision of the defendant to grant benefits to the plaintiff, retroactive to the date of the initial disability, or in the alternative, remand to the Commissioner for reconsidera-

tion of the evidence" (Compl. at 3-4).  Plaintiff filed a motion
for judgment on the pleadings under Rule 12(c) of the Federal
Rules of Civil Procedure on May 14, 2008 (Notice of Motion for
Judgment on the Pleadings, dated May 14, 2008 (Docket Item 12)).

By a letter dated July 25, 2008, the Commissioner
proposed to plaintiff that the action be remanded for further
proceedings with the ALJ, but plaintiff did not consent to this
remand (Memorandum of Law in Support of Defendant's Motion for a
Remand, dated August 29, 2008 (Docket Item 17), ("Def.'s Mem. in
Support") at 2 n.3).  On August 29, 2008, the Commissioner filed
a Notice of Motion and Memorandum of Law in Support of Defen-
dant's Motion for a Remand (Docket Items 16 and 17) requesting
further administrative proceedings pursuant to 42 U.S.C.
§ 405(g).  The Commissioner stated that "there are gaps in the
administrative record relating to treatment at Kingston Hospital
and, thus, further proceedings are necessary to fully develop the
record and obtain this evidence from plaintiff's treating source"
(Def.'s Mem. in Support at 8).

B.  Plaintiff's
    Social Background

Plaintiff was born on October 31, 1963 (Tr. 45).  At
the time of the ALJ hearing he was forty-three years old (Tr.

4

189).  He received his GED in 1981 and reported completing some college credits (Tr. 75, 190).  Plaintiff is married to Tracey Napoli, but stated in his initial application that they were in the process of getting divorced (Tr. 61, 63).  His previous marriage to Ramona Crowder ended in divorce in 2000 (Tr. 61).  He has seven children (Tr. 189).  In his initial application, plaintiff reported that one of his children lived with him, one lived with his grandmother in South Carolina, two lived with Ms. Napoli in Standfordville, New York, and one lived with his mother in Virginia (Tr. 62-63).  At the time of the ALJ hearing, plain-tiff testified that the youngest of his children was one-year-old and that all of his children lived with their mothers, except for one child who was in the air force (Tr. 190).

Plaintiff reported that after his initial injury, his daily routine consisted of caring for his children, completing house chores, watching television, reading, writing and socializ-ing with friends and family (Tr. 78).  He mostly spent his time cooking and eating, playing games, attending "outings" and engaging in conversation (Tr. 82).  Generally, he reported that he could see, hear, talk, reach, and use his hands well, while activities involving walking, standing, or otherwise using his legs "cause[d] [him] difficulty" (Tr. 82).

5

Following his injury, plaintiff began selling narcotics on a daily basis (Tr. 201-02).  He described himself as a "petty drug dealer" earning about twenty to thirty dollars per day, which he claimed was "just enough to feed myself and when the car insurance was due I was able to pay it" (Tr. 202-03).  Prior to the ALJ hearing, plaintiff was sentenced to a six year prison term for possession of a controlled substance (Tr. 200).  He testified that his incarceration began on either September 24th or 26th 2005 (Tr. 197).  Previously, plaintiff had been convicted of "weapon possession" in 1998 and attempted robbery in 1993 (Tr. 201).  He reported that he had been incarcerated for some period of time in 1992 and 1993, and again from March 24, 1998 to July 1, 2002 at the Clinton Correctional Facility in New York State (Tr. 62).

Prior to his injury, plaintiff worked as a developmental aide trainee at a New York State adult mental health facility from September 2003 until he was terminated on March 3, 2005 (Tr. 71).[3]  For eight hours per day, plaintiff assisted persons with

---

[3]It is unclear whether plaintiff last worked at this facility in May 2004 or March 2005.  While plaintiff listed his dates of employment as September 2003 to March 2005 in his initial application, he testified at the ALJ hearing that he was terminated on May 4, 2004 from his job at EDSO State Hospital, where he also claimed to have worked as a developmental aide trainee since September 2003 (Tr. 190-91).  He also testified
(continued...)

developmental disabilities, particularly adult males with violent tendencies, with activities of daily living including shaving, cooking, showering, cleaning, and taking medications (Tr. 71). Plaintiff spent a substantial portion of his time standing and walking, and often had to climb, crouch, kneel and handle large objects[4] (Tr. 72).  Plaintiff sometimes had to restrain patients if they became violent, and reported that the heaviest weight he had had to lift was one hundred pounds or more (Tr. 72, 89).  He more frequently lifted between ten and fifty pounds[5] (Tr. 72, 89).

Plaintiff also worked as a counselor at a child reha-bilitation center for an unspecified period of time in 1997 (Tr. 88).  There he oversaw young people who had been court ordered to attend the facility for substance abuse treatment (Tr. 91, 193). Plaintiff spent three hours per day walking and spent one hour

---

[3](...continued)
that he was fired from this job and had begun to receive unemployment benefits just before his injury, which is consistent with the employment history described in his initial application (Tr. 191).

[4]It is unclear whether plaintiff calculated his time spent on these activities on a daily or weekly basis because the combined hours listed neither add up to eight nor forty hours.

[5]In one portion of plaintiff's report he claimed to have frequently lifted fifty pounds or more (Tr. 72), while in another he claimed to frequently lift between ten to twenty-five pounds (Tr. 89).

7

per day standing, sitting, handling large objects, and handling small objects or writing (Tr. 91).  The heaviest weight that plaintiff lifted at this job was about twenty-five pounds, which plaintiff lifted frequently (Tr. 91).  He testified that on rare occasions he would have to carry supplies and that he may have had to restrain one of the teenagers if necessary (Tr. 194).

From 1995 through 1997, plaintiff worked as a direct care worker at a youth rehabilitation center (Tr. 88).  At this job, plaintiff "cared for" about thirteen children "with various levels of special needs" (Tr. 90).  Four hours of his shift were evenly divided between walking and standing (Tr. 90).  He would also spend one hour per day sitting, handling large objects and handling small objects or writing, with twenty minute intervals spent kneeling, crouching and crawling (Tr. 90).  He would sometimes help the children to sit up and would often carry them, as well as supplies for their care (Tr. 90).  He also cleaned the facility and washed laundry (Tr. 90).  The heaviest weight he lifted while at this job was about one hundred pounds, but he more frequently lifted between twenty-five and thirty pounds (Tr. 90).

Defendant previously worked as a case manager for a housing project from 1994 to 1995 (Tr. 88, 192).  There he oversaw the workings of a housing complex with a team of crisis

intervention and prevention specialists (Tr. 92, 193).  Mainly,
he supervised a security team in this four hundred unit housing
complex (Tr. 92, 193).  He spent four hours per day walking and
four hours divided evenly between standing, sitting, climbing,
handling large objects and handling small objects or writing.  He
also spent about half an hour per day kneeling and half an hour
crouching (Tr. 92).  He frequently lifted weights of about ten
pounds, which was the heaviest weight that he lifted at this job
(Tr. 92).

 Prior to this, defendant worked as a security guard in
a housing project from 1993 to 1994 (Tr. 88).  He patrolled
various apartment buildings and high-drug areas, walking about
five hours per day (Tr. 93).  He also spent about one hour
standing and one hour handling small objects or writing, with
fifteen minutes intervals of kneeling, crouching and crawling
(Tr. 93).  He frequently lifted weights of ten pounds; the most
he lifted was fifty pounds (Tr. 93).

 From 1983 to 1990, plaintiff worked as a printer for
various publications (Tr. 88).  He reported that he operated a
printing press and assisted in other "office related work" (Tr.
94).  He sometimes carried office supplies, including boxes of
paper or ink (Tr. 94).  He spent one hour per day walking and one
hour handling large objects, five hours standing, and half an

hour sitting, with fifteen minute intervals of kneeling or crouching (Tr. 94).  The heaviest weight he lifted while at this job was fifty pounds, but he most frequently lifted objects weighing less than ten pounds (Tr. 94).

    C.  Plaintiff's
    <u>Medical Background</u>

    1.  Information
    <u>Reported by Plaintiff</u>

Plaintiff reported that several cases of water fell on his left ankle while he was shopping at a Walmart store in Kingston, New York, breaking his left fibula[6] near his ankle (Tr. 62, 70, 191).  Plaintiff claimed that following this accident he wore a cast up to his knee and had difficulty walking and stand-ing (Tr. 71).  He also reported that he was able to do mostly everything he did before his injury, "just not as much or as often" (Tr. 78).  This included indoor and outdoor chores (Tr. 80).  He prepared his own meals daily, which he claimed took him about two hours, but noted that he was eating and cooking less than before his injury because he had difficulty standing for

---

[6]Fibula refers to the outer and smaller of the two bones of the leg, which articulates proximally with the tibia and distally is joined to the tibia in a syndesmosis.  <u>Dorland's Illustrated Medical Dictionary</u>, 712 (31st ed. 2007) ("<u>Dorland's</u>").

long periods of time (Tr. 79).  He completed his own shopping, which took him "anywhere from 10 minutes to 2 hours" (Tr. 81). He reported no difficulty with personal care (Tr. 78-79).

Plaintiff maintained that his hobbies and interests included "physical fitness, children, cooking and outdoor activities" which he engaged in "as often as time, money and my health allows" (Tr. 81).  He sometimes used crutches, a cane, or a brace or splint to help him walk long distances, stand for long periods, complete chores and shop (Tr. 83).  He reported being able to walk one-sixteenth of a mile before needing to rest for about ten to fifteen minutes (Tr. 83).

Plaintiff reported that he experienced uncomfortable sharp pains at times, accompanied by throbbing and swelling, limiting his movement (Tr. 85).  He felt this pain in the arch of his foot and in his calf, and reported that it would sometimes radiate into his back (Tr. 85).  He also stated that he occasionally had trouble getting comfortable when attempting to sleep if he was wearing a cast or was otherwise in pain (Tr. 78).

In his initial application, plaintiff first stated that he was not taking any medication for this injury (Tr. 74).  He later reported that he had received one prescription for Vicodin (Tr. 86-87) and often took Tylenol for pain (Tr. 86-87).

On October 25, 2006, plaintiff filed an appeal in which he described new injuries (Tr. 96-100).  He reported that in June 2005 he "broke [his] right foot in two places two days after the cast was removed from [his] left leg and [his] right elbow was dislocated and had to be reset" and that he had "also been stabbed in [his] back" (Tr. 96).  He also reported suffering "injuries on [his] head" in July 2005 (Tr. 97-98).  At the ALJ hearing, he testified that he had a puncture wound in his head and was treated with eight staples, which were removed just prior to September 2005 (Tr. 197).  As a result of these injuries, plaintiff was unable to walk, bend his arm and had back pain (Tr. 96, 98).  In his appeal report, he stated that he was taking the antibiotic Cephalexin[7], Hydrocod[8], Hydrocodone[9] with APAP, and Vicodin, all causing drowsiness (Tr. 98).  During the ALJ hearing, plaintiff testified that he was prescribed Vicoden twice,

---

[7]Cephalexin refers to a semisynthetic first-generation cephalosporin, effective against a wide-range of gram-positive and a limited range of gram-negative bacteria; administered orally in the treatment of tonsillitis, otitis media, and infections of the genitourinary tract, of bones and joints, and of skin and soft tissues.  See Dorland's at 335.

[8]Though plaintiff listed this as a separate medication, it is likely that he mistakenly began to list Hydrocodone. "Hydrocod" does not appear in Dorland's.

[9]Hydrocodone refers to a semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects.  See Dorland's at 890.

but he was unsure how many bottles he actually received (Tr. 198).  He believed that he stopped taking this medication in August or September 2005 (Tr. 199).  He did not require surgery for any of these injuries (Tr. 195).

    2.  <u>Treatment Records</u>

Plaintiff has visited several physicians and clinics for treatment of his injuries.  Specifically, he was treated at The Kingston Hospital and Benedictine Hospital, and was examined at Odgensburg Correctional Facility after his incarceration.  He was unable to provide the ALJ with the names of any individual doctors who treated him for his injuries (Tr. 200).

    a.  March 2005 Treatment at The
<u>Kingston Hospital Emergency Department</u>

Plaintiff went to the Emergency Department ("ED") at Kingston Hospital on March 9, 2005 following his injury at Walmart (Tr. 110).  The records indicate that plaintiff's chief complaint at this time was "immediate severe pain and inability to bear weight" after the Walmart merchandise had fallen on his ankle (Tr. 118, 120).  In the Neuro Assessment section of the Nursing Record, the nurse noted that plaintiff presented as "confused" and refused to remove his shoe (Tr. 120).

Plaintiff received x-rays and was diagnosed with a spiral fracture[10] of the lateral malleolus[11], or fractured left ankle (distal[12] fibula) (Tr. 110, 117-19, 121-22).  He was told that he should place ice on his leg, keep it elevated and use crutches to avoid putting weight on the injured ankle (Tr. 110, 113, 117, 121).  He was also given a soft splint and instructed to take Tylenol or Vicoden (Tr. 1-6, 110, 117, 121).

Plaintiff returned to the Kingston ED on March 24, 2005 and March 25, 2005[13].  The Nursing Record indicates that plaintiff had an "ex lateral malleous" and had been told to return to the hospital for casting now that the swelling in his ankle had decreased (Tr. 115).  This record also indicates that plaintiff

---

[10]Fracture refers to the breaking of a part, especially a bone, or a break or rupture in a bone.  A spiral fracture refers to one in which the bone has been twisted apart.  See Dorland's at 751, 754.

[11]Malleolus refers to the anatomic nomenclature for a rounded process, such as the protuberance on either side of the ankle joint.  A lateral malleolus refers to the process on the lateral side of the distal end of the fibula, forming, with the malleolus medialis, the mortise is which the talus articulates.  See Dorland's at 1114.

[12]Distal refers to something that is remote; farther from any point of reference; opposed to proximal.  See Dorland's at 562.

[13]Some records state that plaintiff was seen on March 24, 2005 (Tr. 111-16) while others note the date as March 25, 2005 (Tr. 105-09).  There is no indication that plaintiff was admitted to the hospital overnight.

was taking Vicoden (Tr. 115).  The nurse noted that plaintiff had ecchymosis[14] on his left toes, but otherwise presented normally (Tr. 106).

The ED records note that plaintiff "refuse[d] to meet Dr. Null[, plaintiff's attending physician] for placement of cast on [left] leg" (Tr. 105-06).  Dr. Null reported that he had seen plaintiff on March 9, 2005 when he had referred plaintiff to the "HVO" clinic, which referred him back to Kingston Hospital for casting (Tr. 113).  At this time, plaintiff was given a replacement splint and was discharged to his home after receiving verbal instructions from Dr. Null to call Hudson Valley Orthopedics for follow-up care (Tr. 105-06, 111-12, 114, 116).[15]

b.  Benedictine Hospital

On March 15, 2005, plaintiff went to Benedictine Hospital to have a cast placed on his leg.  Dr. Kristin Wolf, the emergency physician who treated plaintiff, noted that plaintiff reported that Orthopedic Associates "told him that he had to pay up front so he decided to [go to Benedictine Hospital] to get

---

[14]Ecchymosis refers to a small hemorrhagic spot in the skin or mucous membrane forming a nonelevated, roundish or irregular, blue or purplish patch.  See Dorland's at 595.

[15]It is unclear from the records if plaintiff's leg was casted at Kingston Hospital or at another clinic entirely.  The ALJ should investigate this issue on remand.

casted instead" (Tr. 135).  In the "Physical Exam" section of her report, Dr. Wolf noted that plaintiff's "left foot was splinted appropriately" (Tr. 135).  Dr. Wolf then noted in the "Management and Plan" section that "[t]he patient was advised that full testing is not done in the emergency room.  He was given the number for orthopedic clinic and asked to follow-up there" (Tr. 135).  Dr. Wolf further observed that "[h]ealing of this fracture takes about four to eight weeks" (Tr. 134).  Next to "Current Medications" Dr. Wolf listed Vicodin (Tr. 135), but the ED Nursing Documentation indicated that plaintiff had not actually taken any Vicodin at that point (Tr. 132).

        Plaintiff went to the Podiatry Clinic at Benedictine Hospital on March 24, 2005.  The record of this visit states that "patient with this type of fracture is not appropriate for podiatry clinic.  Patient will return to Kingston Hospital ER. He believes he needs to be casted" (Tr. 131).

        On April 12, 2005, plaintiff went to the Benedictine Orthopedic clinic to have his cast removed (Tr. 128).  Dr. Thomas Koshy observed in his Radiology Report that "[t]hree views of left ankle show healing aligned fracture lateral malleolus. There is a callous at the fracture site.  Bone union is not complete.  Ankle mortise in intact" (Tr. 128).  That day, Dr. Stephen Maurer provided plaintiff with a note stating "Robert may

16

return to work full duty without restriction on 5/12/05" (Tr. 130, 145).

### c.  June and July 2005 Treatment at Kingston Hospital

On June 16, 2005, plaintiff returned to the Kingston ED complaining of pain in his left arm and right ankle (Tr. 167-68). The records indicate that Dr. David Cheng examined plaintiff on this date (Tr. 167).  While Dr. Cheng's notes are somewhat illegible, he appears to state that plaintiff's injuries resulted from a fight (Tr. 168).  The Nursing Report indicates that plaintiff had an injury to his right ankle and presented with a left elbow with an "obvious deformity" (Tr. 169).  The Neuro Assessment described plaintiff as "difficult" (Tr. 169).

Plaintiff's discharge form indicates that plaintiff again consulted with Dr. Null and was diagnosed with a dislocated left elbow and fractured right malleolus (Tr. 170).  Plaintiff's Radiology Consultation, completed by Dr. Sider Lee, showed that "[f]ractures are identified in the three views of the [right] ankle of the posterior malleolus and the lateral malleolus.  The medial malleolus appears spared" (Tr. 171).  Regarding plain-tiff's left elbow, the form noted "[t]here is dislocation seen at

the olecranon[16] process.  No definite fracture is identified"
(Tr. 172).

Plaintiff returned to Kingston Hospital on June 23,
2005 and reported that he fell backwards down a flight of stairs
when he put weight on his ankle (Tr. 175).  A nurse noted that he
had been casted the week before but had removed the cast himself
that same evening due to his swelling and pain (Tr. 173-75).
Some of the notes from this visit are illegible, but they indi-
cate that plaintiff did not fill his prescription for pain
medication (Tr. 175).

Dr. Sider Lee again completed a Radiology Consultation
for plaintiff's right ankle (Tr. 176).  He reported that "[t]hree
views of the right ankle again demonstrates a healing lateral
malleolar fracture.  A fracture line is still identified.  There
is normal bony alignment" which led him to determine that the
malleolar fracture was healing (Tr. 176).

On July 19, 2005, plaintiff returned to the Kingston ED
to have staples removed from a head wound (Tr. 177).  The Nursing
Record bears the words "lost the paperwork[,]" but does not

---

[16]Olecranon refers to the proximal bony projection of the
ulna at the elbow, its anterior surface forming part of the
trochlear notch.  See Dorland's at 1337.

indicate whether it was lost by plaintiff or the hospital (Tr. 177).  Vicodin is noted as his current medication (Tr. 177).

### d.   The Ogdensburg Correctional Facility

On March 26, 2007, M.S. Landy, R.N., the Nurse Administrator at Ogdensburg Correctional Facility, informed the Social Security Administration that "Mr. Henderson has no major medical issues at this time" (Tr. 158).  She did not provide any further records.

### 3.   Medications

It appears that plaintiff was prescribed Vicodin both when he was injured in March and June 2005 (Tr. 86-87, 98).  However, neither plaintiff's medical records nor his testimony make clear whether and for how long he took this medication (Tr. 131, 134, 198-99).  Plaintiff more often reported taking Tylenol for pain (Tr. 86-87).  In his "Disability Report - Appeal" form, he stated that he was currently taking the antibiotic Cephalexin, Hydrocod, Hydrocodone with APAP, and Vicodin, all causing drowsiness (Tr. 98).

4.   <u>Consultative Physicians</u>

a.   <u>Dr. Ann Marie Finegan</u>

Dr. Ann Marie Finegan, an orthopedist at Industrial Medicine Associates, P.C., examined plaintiff on May 17, 2005. At that time, only plaintiff's left ankle had been injured. Plaintiff reported that he was injured in March 2005 when water bottles, weighing over 100 pounds collectively, fell onto his left ankle (Tr. 137).  He reported that the pain and swelling was so intense he could not stand and had to be assisted to the Kingston emergency room (Tr. 137).  He further reported that he had a fractured fibula and had been placed in a cast.  Dr. Finegan noted that plaintiff "presented several times over the past few weeks to the Benedictine Hospital Group, at which time the cast was initially replaced and then he advanced to his current use of an air stirrup[17] with first crutches and later a cane" (Tr. 137).  Plaintiff reported that during his follow-up appointments he had been told of excellent wound and bone healing and no surgical intervention was expected, but that he was still experiencing pain and instability (Tr. 137).  Dr. Finegan noted

---

[17]Stirrup refers to a structure or device resembling the stirrup of a saddle, or the portion of an apparatus on which to rest the feet.  <u>See</u> <u>Dorland's</u> at 1800.

20

that plaintiff had mild swelling which was alleviated by eleva-
tion of the leg, and that he only took Tylenol for pain (Tr.
137).  Plaintiff reported to Dr. Finegan that he still performed
all household chores, but that his left ankle injury limited his
ability to perform certain activities, such as shopping (Tr.
138).  He claimed to enjoy watching television, listening to the
radio, reading and playing on the computer (Tr. 138).

Dr. Finegan noted that plaintiff did not appear to be
in any acute distress (Tr. 138).  However, his gait was not
normal and he suffered pain when bearing weight on his left leg
(Tr. 138).  She stated that plaintiff did not have his cane with
him at the examination, but that "in my medical opinion this is
necessary[,]" and she advised plaintiff not to leave the house
without it again (Tr. 138).  She noted that plaintiff was unable
to perform a full squat because he could not put his weight on
his left leg, but he did not have difficulty standing statically,
changing for the exam, getting on and off the table, and rising
from a chair (Tr. 138).

Dr. Finegan did not find any abnormality with plain-
tiff's fine motor activity of his hands, his cervical spine[18],

---

[18]Cervical spine refers to that portion of the spine
comprising the cervical vertebrae.  See Dorland's at 1774.

upper extremities, and thoracic[19] and lumbar[20] spine (Tr. 138-39).
He had full rotation of movement in his hips, knees and right
ankle (Tr. 139).  The mobility of his left ankle was "limited
such that actively he demonstrates dorsiflexion[21] only to 10
[degrees], plantar[22] flexion[23] only to 20 [degrees].  There is no
sub talar[24] movement present" (Tr. 139).  She also noted that
plaintiff's peroneus[25] tendons were slightly tender and that
there was a "small bland effusion[26] present at the left ankle"
(Tr. 139).  She did not detect any muscle atrophy nor sensory

---

[19]Thoratic spine refers to that part of the spine comprising
the thoratic vertebrae.  See Dorland's at 1775.

[20]Lumbar spine refers to that portion of the spine
comprising the lumbar vertebrae.  See Dorland's at 1774.

[21]Dorsiflexion refers to flexion or bending toward the
extensor aspect of a limb, as the hand or foot.  See Dorland's at
570.

[22]Plantar means pertaining to the sole of the foot.  See
Dorland's at 1476.  Plantar flexion refers to the bending of the
toes or foot downward toward the sole.  See Dorland's at 725.

[23]Flexion refers to the act of bending or condition of being
bent.  See Dorland's at 725.

[24]Talar means pertaining to the talus, which is the highest
of the tarsal bones and the one that articulates with the tibia
and fibula to form the ankle joint.  See Dorland's at 1892, 1893.

[25]Peroneal means pertaining to the fibula or the lateral
aspect of the leg.  See Dorland's at 1440.

[26]Effusion refers to the escape of fluid into a part or
tissue, as an exudation or a transudation.  See Dorland's at 603.

abnormality (Tr. 139).  His reflexes were physiologic[27] and symmetric[28] (Tr. 139).  Dr. Finegan diagnosed plaintiff with a "fibula fracture which appears to be doing well" and noted plaintiff's prognosis as "good" (Tr. 139).

Dr. Finegan also noted that plaintiff was at least temporarily very limited in his ability to perform physical tasks and noted that, for the following two weeks, he would be limited due to his inability to bear weight on his left leg (Tr. 139). After two weeks, Dr. Finegan predicted that plaintiff would be able to engage in more activities, but that he should not climb ladders, play sports, jump, or prolong weight bearing on his right leg (Tr. 139).  She also noted that physical therapy would probably benefit plaintiff and should be started about three weeks after their appointment (Tr. 139).  She anticipated that plaintiff would return to regular activities in six to eight weeks (Tr. 139).

---

[27]Physiologic means normal; not pathologic; characteristic of or conforming to the normal functioning or state of the body or a tissue or organ.  See Dorland's at 1464.

[28]Symmetry refers to the similar arrangement in form and relationships of parts around a common axis, or on each side of a plane of the body.  See Dorland's at 1841.

b.   <u>Dr. Pesho Kotval</u>

Dr. Pesho Kotval from the Manchester Mill Center provided a Radiology Report concerning plaintiff's left ankle. Dr. Kotval examined plaintiff on May 17, 2005 at which time he took an x-ray of the left tibia and fibula (Tr. 140).  Dr. Kotval reported that "A-P and lateral views reveal the cortex[29] of the tibia and fibula to be intact.  The trabecular[30] bone pattern is also intact.  The mortise joint is normal.  No soft tissue calcification[31] is noted" (Tr. 140).  Dr. Kotval classified these as "[n]ormal findings in the left tibia and fibula" (Tr. 140).

c.   <u>Karla Miller</u>

On March 9, 2006, Karla Miller, a consultant with the Social Security Administration, completed a physical residual functional capacity assessment of plaintiff based on the evidence in the file (Tr. 141-46).  Miller opined that plaintiff could

---

[29]Cortex refers to an external layer; the outer layer of an organ or other body structure.  <u>See</u> <u>Dorland's</u> at 428.

[30]Trabecular means pertaining to a trabecula, which refers to a supporting or anchoring strand of connective tissue.  A trabeculae of bone refers to anastomosing bony spicules in cancellous bone which form a meshwork of intercommunicating spaces that are filled with bone marrow.  <u>See</u> <u>Dorland's</u> at 1970.

[31]Calcification refers to the process by which organic tissue becomes hardened by a deposit of calcium salts within its substance.  <u>See</u> <u>Dorland's</u> at 273.

lift or carry twenty pounds occasionally and ten pounds fre-
quently, and that plaintiff could stand, walk or sit for about
six hours in an eight-hour workday (Tr. 142).  Miller also found
that plaintiff's ability to push and pull was unlimited (Tr.
142).  In terms of his postural limitations, Miller noted only
that plaintiff may be occasionally and only slightly limited in
his ability to climb ramps, stairs, ladders, rope or scaffolds
due to pain in his left ankle (Tr. 143).  Plaintiff had no
manipulative, visual, communicative, nor environmental limita-
tions (Tr. 143-44).  Miller also noted that plaintiff complained
of left leg and ankle pain limiting his ability to walk or stand
for prolonged periods, but that plaintiff was able to perform
household activities, child care, cook and use public transporta-
tion (Tr. 144).  Miller stated that plaintiff's claimed limita-
tions were, therefore, only "partially credible" (Tr. 144).

Miller indicated that treating or examining source
statements were in the file, but raised some concerns with that
evidence (Tr. 145).  Specifically, she noted that, to the extent
that Dr. Maurer opined that claimant could have returned to work
on May 12, 2005, that opinion was reserved for the Commissioner
(Tr. 145).  Miller also noted that Dr. Finegan's indication that
plaintiff was limited to certain physical tasks for two weeks and

should return to regular activities in six to eight weeks was
considered and incorporated into the RFC (Tr. 145).

    D.  Proceedings
       <u>Before the ALJ</u>

      The ALJ conducted a video hearing on May 3, 2007 at
which plaintiff testified (Tr. 180-204).  Plaintiff and the ALJ
first discussed plaintiff's right to be represented by an attor-
ney (Tr. 182-85).  Plaintiff stated that he was previously
unaware of this right, and asked whether the absence of any
documentation would have any bearing on the ALJ's decision (Tr.
183-84).  The ALJ responded:

> ALJ:      It could.  We try to get as a complete file
> as we can . . . .  In terms of medical re-
> cords, we have obtained some medical records
> concerning your case.  We wrote to the cor-
> rectional facility where you are and asked
> for medical records but they didn't send us
> any and we had some records from Benedictine
> (phonetic) Hospital indicating the last time
> you were seen there was April 12th 2005.  And
> we have reports of examinations that the
> agency sent you to.  And we have some records
> from the x-ray in April 2005 and we have
> records from Benedictine Hospital that go
> through April 2005.  We have an emergency
> room record from Kingston (phonetic) Hospi-
> tal.  And that's pretty much what we have in
> your file for medical records

(Tr. 184).  After the ALJ explained the appeals process, plain-
tiff decided to proceed without a representative (Tr. 184-85).

Plaintiff first testified concerning his educational history and family situation.  Plaintiff stated that he "finished school" and has completed "a couple of college credits" (Tr. 190).  He testified that he was forty-three years old and married with seven children (Tr. 189).  All of these children were living with their mothers, of which there are three, except for one child who was in the air force (Tr. 189-90).  The youngest child was one-year-old at the time of the hearing (Tr. 190).

Plaintiff then testified about his employment history. He stated that his last date of employment was on May 4, 2004 when he was working for EDSO State Hospital (Tr. 190).  He claimed to have worked there since September 2003 as a develop- mental aide trainee assisting "in developmental care of disabled and mentally and disabled individuals" (Tr. 191).  He testified that this employment ended when there was a "discrepancy" about his restraining a client.  He was placed on administrative leave and ultimately fired (Tr. 191).  However, he stated that he had an administrative hearing in Westchester and was found "not guilty of abusing anyone" (Tr. 191).  While that "situation was pending," plaintiff received unemployment benefits (Tr. 191).

Plaintiff also testified regarding his prior positions at a children's rehabilitation center, as a case manager at a housing project, a security guard at a housing project and as a

printer[32] (Tr. 192-94).  As a child rehabilitation counselor,
plaintiff worked for "DAYTA (phonetic[),]" which he described as
a facility for young people receiving treatment for substance
abuse in lieu of incarceration (Tr. 193).  He testified that he
would sometimes carry supplies and that he may have had to
restrain one of the teenagers if necessary (Tr. 194).  Plaintiff
testified that he worked at this facility for six months until
the Department of Motor Vehicles confused his name with someone
else's and he "ended up with like forty something suspensions and
so I was told if I was to drive on the complex and hit one of the
kids or something like that that the agency would be in court"
(Tr. 194).

He testified that as a case manager at a housing
complex he "oversaw a security that we basically did property
management in housing complexes and so forth where we curbed drug
activity . . . tried to quell a situation before it got out of
hand before it was required for police officers to be present"
(Tr. 193).  Plaintiff would surveil the perimeter of the complex
and confront those he believed to be dealing drugs or gambling,
as well as those loitering in the staircase, playing loud music,
or involved in domestic disputes (Tr. 193).

_____

[32]Plaintiff's duties in these positions are described in
detail in Section II.B above.

28

Plaintiff also discussed his criminal history.  As stated in Section II.B, prior to the ALJ hearing, plaintiff had been sentenced to a six year prison term for possession of a controlled substance (Tr. 200).  He had been previously convicted of a weapon possession charge in 1998 and attempted robbery in 1993 (Tr. 201).  At the time of his most recent arrest, plaintiff had been selling narcotics on a daily basis (Tr. 201-02).  He stated that he had been living with his girlfriend until they had a "falling out," prompting him to move in with his brother in Kingston (Tr. 201).  He testified that he felt he had exhausted his options in that he was "physically disabled . . . unemployment ran out, social security . . . seemed in the distant future.  Social services had turned [him] down . . . [he] and [his] wife [were] at odds" (Tr. 202).  He stated that he was supposed to be released from prison in 2010, but that he had a merit board evaluation in 2009 and could be eligible for work release within six months of the ALJ hearing (Tr. 200).

Plaintiff also testified concerning his injuries.  He reported that on March 9, 2004[33], shortly after he was fired from the adult rehabilitation facility, he broke his left ankle while shopping at a department store (Tr. 191-92).  Two days after he

---

[33]Medical records indicate that plaintiff's injury occurred March 9, 2005 (Tr. 110, 117-122).

got the cast removed from his left ankle, he broke his right
ankle and his left arm (Tr. 194).  He claimed that he subse-
quently could not care for himself and could not "move around"
(Tr. 194).  When asked what kind of medical treatment he received
for these injuries, plaintiff responded "[c]asts and Vicadin
[sic]" (Tr. 195).  He did not require surgery for any of these
injuries and, regarding his left arm, he testified that "[t]he
arm was set.  The . . . arm was set back in place . . . .  The
bone is kind of I don't know it was detached on the inside and
they gave me some morphine to put me out and reset the arm some
kind of way" (Tr. 195).  Plaintiff did not testify as to the
source of any injuries beyond his broken left ankle.

Plaintiff also described the medical treatment he
received for these injuries.  He testified that he went to
Kingston Hospital after his first injury and that they sent him
to Benedictine Hospital for casting (Tr. 195).  He reported that
he then had to "kind of follow that cast guy around in order to
get a cast" (Tr. 195).  He noted that there were complications
when his right ankle was casted because the cast was put on while
his foot was still swelling (Tr. 198).  He did not receive any
subsequent therapy (Tr. 195).  Plaintiff also stated that he
received eight stitches for a puncture wound in his head (Tr.

197).   Those staples were removed at Kingston Hospital prior to
September 2005 (Tr. 197).

He testified that he later went to "another type office
where I had to go where they cut the cast off and they gave me
these braces" (Tr. 195).  He got the same type of brace after he
broke each of his ankles (Tr. 195-96).  Plaintiff did not remem-
ber the name of the physician or facility that prescribed the
brace for him, but stated that it was "some sort of aftercare"
and that "the people that cut the cast off actually gave me the
brace" (Tr. 196).  He described this facility as "residential"
but could not remember its name (Tr. 196).  He testified that he
had a brace on when he was incarcerated but that he was not
allowed to wear it into the correctional facility (Tr. 196).
After he was incarcerated, he claims he was "given sort of like a
sock in Dutchess (phonetic) County Jail" which was made out of a
spandex-like material (Tr. 196-97).

When asked if he saw only one doctor for his casting
procedures, plaintiff responded that "there were other individu-
als that I encountered coming, you know, through the hospital,
between the two hospitals" and that he believed a charity service
at Benedictine Hospital had partially paid for his medical
treatment (Tr. 199).  He claimed to have more information about
the names of his doctors in another location which he could not

31

access due to his incarceration (Tr. 200).  He also noted that he had planned to file a lawsuit against the department store, but his incarceration prevented him from doing so (Tr. 200).

Plaintiff testified that he believed these injuries would have prevented him from working had he not been incarcerated (Tr. 197).  He stated that he had "healed up in the jail the rest of the way," but sometimes he is negatively affected by the weather (Tr. 197).  He claimed that "[i]t's been cold and the weather has changed and I have been having little difficulty with my right leg where it was broke.  My right ankle which was broken in two places . . . from that time until probably six months into my incarceration I would not have been able to work" (Tr. 197-98).  As a way of explanation, plaintiff testified that he "couldn't even do a push up" and that he presently could not straighten his arm completely, but is able to "get it more of the motion way out" (Tr. 198).  He also testified that he was able to "lift things and move around more or less normal.  I believe I have most of, you know, most of my physical ability at this time" (Tr. 198).  He was not being treated for any of his injuries while incarcerated and stated that the doctor in the correctional facility told him that he is getting older and should work on stretching the tendon in his right ankle (Tr. 198).  Plaintiff testified that he doesn't "play too much" with his legs and does

not want to attempt to jog or stretch much because of his fear
that if he were to cause more damage to his injured extremities
he would not be able to get the type of assistance that he needs
in prison (Tr. 198).

        In terms of medication, plaintiff testified that he did
not remember the amount of Vicodin he received while suffering
from his injuries (Tr. 198).  He recalled that he was prescribed
the drug both times he broke his ankle and stopped taking it in
August or September 2005 (Tr. 199).

III.  <u>Analysis</u>

    A.  Applicable Legal
        <u>Principles</u>

        1.  <u>Standard of Review</u>

        The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or if it is based upon an erroneous legal standard.  42 U.S.C.
§ 405(g); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127-28 (2d Cir. 2008);
<u>Veino v. Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Shaw v.
Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Tejada v. Apfel</u>, 167
F.3d 770, 773 (2d Cir. 1999); <u>Bubnis v. Apfel</u>, 150 F.3d 177, 181
(2d Cir. 1998).  The Court first reviews the Commissioner's

decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  Tejada v. Apfel, supra, 167 F.3d at 773; Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987); Ellington v. Astrue, 641 F. Supp. 2d 322, 327-28 (S.D.N.Y. 2009) (Marrero, D.J.); Santiago v. Barnhart, 441 F. Supp. 2d 620, 625 (S.D.N.Y. 2006) (Marrero, D.J.).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision."  Ellington v. Astrue, supra, 641 F. Supp. 2d at 328; accord Johnson v. Bowen, supra, 817 F.2d at 986 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, applica-tion of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.").  However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."  Johnson v. Bowen, supra, 817 F.2d at 986.

2.  Determination of
    Disability

Under Title II of the Social Security Act, 42 U.S.C.
§§ 401 et seq., a claimant is entitled to disability benefits if
he or she can establish an "inability to engage in any substan-
tial gainful activity by reason of any medically determinable
physical or mental impairment . . . which has lasted or can be
expected to last for a continuous period of not less than 12
months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also
Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment
and inability to work must last twelve months).  The impairment
must be demonstrated by "medically acceptable clinical and
laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it
must be

> of such severity that [the claimant] is not only unable
> to do his previous work but cannot, considering [the
> claimant's] age, education, and work experience, engage
> in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether
> such work exists in the immediate area in which [the
> claimant] lives, or whether a specific job vacancy
> exists for [the claimant], or whether [the claimant]
> would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner must consider both objective and
subjective factors when assessing a disability claim, including:
(1) objective medical facts and clinical findings; (2) diagnoses

35

or medical opinions of examining physicians; (3) subjective

evidence of pain or disability to which the claimant and family

or others testify; and (4) the claimant's educational background,

age and work experience. Brown v. Apfel, 174 F.3d 59, 62 (2d

Cir. 1999); Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir.

1983).

"In evaluating disability claims, the [Commissioner] is

required to use a five-step sequence, promulgated in 20 C.F.R.

§§ 404.1520, 416.920." Bush v. Shalala, 94 F.3d 40, 44 (2d Cir.

1996).

> First, the Commissioner considers whether the claimant
> is currently engaged in substantial gainful activity.
> Where . . . the claimant is not so engaged, the Commis-
> sioner next considers whether the claimant has a "se-
> vere impairment" that significantly limits his physical
> or mental ability to do basic work activities . . . .
> Where the claimant does suffer a severe impairment, the
> third inquiry is whether, based solely on medical
> evidence, he has an impairment listed in Appendix 1 of
> the regulations or equal to an impairment listed
> there . . . .  If a claimant has a listed impairment,
> the Commissioner considers him disabled.  Where a
> claimant does not have a listed impairment, the fourth
> inquiry is whether, despite his severe impairment, the
> claimant has the residual functional capacity to per-
> form his past work . . . .  Finally, where the claimant
> is unable to perform his past work, the Commissioner
> then determines whether there is other work which the
> claimant could perform.

Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); see also

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Butts v. Barnhart,

388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds on

rehearing, 416 F.3d 101 (2d Cir. 2005); Green-Younger v.
Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v. Chater, supra,
221 F.3d at 132; Brown v. Apfel, supra, 174 F.3d at 62; Tejada v.
Apfel, supra, 167 F.3d at 774; Rivera v. Schweiker, supra, 717
F.2d at 722.

Step four requires that the ALJ make a determination as
to the claimant's residual functional capacity ("RFC").  See
Sobolewski v. Apfel, 985 F. Supp. 300, 309 (E.D.N.Y. 1997).  RFC
is defined in the applicable regulations as "the most [the
claimant] can still do despite [his] limitations."  20 C.F.R.
§§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC, the ALJ
makes a "function by function assessment of the claimant's
ability to sit, stand, walk, lift, carry, push, pull, reach,
handle, stoop, or crouch."  Sobolewski v. Apfel, supra, 985 F.
Supp. at 309.  The results of this assessment determine the
claimant's ability to perform the exertional demands of sustained
work, and may be categorized as sedentary,[34] light,[35] medium,

_____

[34]Sedentary work generally involves up to two hours of
standing or walking and six hours of sitting in an eight-hour
workday.  SSR 96-9p, 1996 WL 374185 at *3 (1996); see 20 C.F.R.
§§ 404.1567(a), 416.967(a).  Sedentary work also involves
"lifting no more than 10 pounds at a time and occasionally
lifting or carrying articles like docket files, ledgers, and
small tools."  20 C.F.R. §§ 404.1567(a), 416.967(a).

[35]"Light work involves lifting no more than 20 pounds at a
time with frequent lifting or carrying of objects weighing up to
                                        (continued...)

heavy or very heavy.  20 C.F.R. §§ 404.1567, 416.967; see Rodri-
guez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL 150981 at *7 n.7
(S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

     The claimant bears the initial burden of proving
disability with respect to the first four steps.  Burgess v.
Astrue, supra, 537 F.3d at 128; Green-Younger v. Barnhart, supra,
335 F.3d at 106; Balsamo v. Chater, supra, 142 F.3d at 80.  Once
the claimant has satisfied this burden, the burden shifts to the
Commissioner to prove the final step -- that the claimant's RFC
allows the claimant to perform some work other than the claim-
ant's past work.  Balsamo v. Chater, supra, 142 F.3d at 80; Bapp
v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

     In meeting [his] burden of proof on the fifth step
of the sequential evaluation process described above,
the Commissioner, under appropriate circumstances, may
rely on the medical-vocational guidelines contained in
20 C.F.R. Part 404, Subpart P, App. 2, commonly re-
ferred to as "the Grid."  The Grid takes into account
the claimant's RFC in conjunction with the claimant's
age, education and work experience.  Based on these
factors, the Grid indicates whether the claimant can
engage in any other substantial gainful work which
exists in the national economy.

---

[35](...continued)
ten pounds."  20 C.F.R. § 404.1567(b).  Light work often
"requires a good deal of walking or standing" or "sitting most of
the time with some pushing and pulling of arm or leg controls."
20 C.F.R. § 404.1567(b).

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995) (Koeltl, D.J.).  When a claimant retains the RFC to perform at least one of the categories of work listed on the Grid, and when the claimant's educational background and other characteristics are also captured by the Grid, the ALJ may rely exclusively on the Grid in order to determine whether the claimant retains the RFC to perform some work other than his or her past work.  Butts v. Barnhart, supra, 388 F.3d at 383 ("In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the [Grid]).") (internal quotation and citation omitted).

However, "exclusive reliance on the [Grid] is inappropriate" where non-exertional limitations "limit the range of sedentary work that the claimant can perform."  Butts v. Barnhart, supra, 388 F.3d at 383, quoting Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (internal quotation omitted); Bapp v. Bowen, supra, 802 F.2d at 603.  When a claimant suffers from a non-exertional limitation such that she is "unable to perform the full range of employment indicated by the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid fails "to describe the full extent of [the] claimant's physical limitations," the Commissioner must introduce the testimony of a vocational expert in order to prove "that jobs exist in the economy which the claimant

can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383 (internal quotation and citation omitted from first quotation); see 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

### 3.   Treating Physician Rule

When considering the evidence in the record, the ALJ is required to give deference to the opinions of a claimant's treating physicians.  Under the regulations' "treating physician rule," a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. § 404.1527(d)(2); Shaw v. Chater, supra, 221 F.3d at 134; Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).  Before giving a treating physician's opinion less than controlling weight, the ALJ must apply various factors to determine the amount of weight the opinion should be given.  These factors include:  (1) the length of the treatment relationship and the frequency of exami-

nation; (2) the nature and extent of the treatment relationship; (3) the medical support for the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.) (adopting Report and Recommendation of Freeman, M.J.); Matovic v. Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan 12. 1996) (McKenna, D.J.).  "[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight.  20 C.F.R. § 404.1527(d)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *6 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).

        4.  Development
            of the Record

        "It is the rule in the [Second C]ircuit that 'the ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'"  Pratts v. Chater, 94 F.3d 34, 37 (2d

Cir. 1996), quoting Echevarria v. Sec'y of Health & Human Servs.,
685 F.2d 751, 755 (2d Cir. 1982).

> Because a hearing on disability benefits is a non-
> adversarial proceeding, the ALJ generally has an affir-
> mative obligation to develop the administrative record.
> Echevarria v. Secretary of Health & Human Servs., 685
> F.2d 751, 755 (2d Cir. 1982).  This duty exists even
> when the claimant is represented by counsel . . . .
> The [Commissioner's] regulations describe this duty by
> stating that, "[b]efore we make a determination that
> you are not disabled, we will develop your complete
> medical history . . . [and] will make every reasonable
> effort to help you get medical reports from your own
> medical sources when you give us permission to request
> the reports."  20 C.F.R. § 404.1512(d).

Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); see Halloran v.
Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) ("We have stated many
times that the ALJ generally has an affirmative obligation to
develop the administrative record . . . .") (internal quotations
and citation omitted); Shaw v. Chater, supra, 221 F.3d at 131
("The ALJ has an obligation to develop the record in light of the
non-adversarial nature of the benefits proceedings, regardless of
whether the claimant is represented by counsel."); Tejada v.
Apfel, supra, 167 F.3d at 774 (same); Van Dien v. Barnhart, 04
Civ. 7259 (PKC), 2006 WL 785281 at *14 (S.D.N.Y. Mar. 24, 2006)
(Castel, D.J.) (same); Molina v. Barnhart, 04 Civ. 3201 (GEL),
2005 WL 2035959 at *6 (S.D.N.Y. Aug. 17, 2005) (Lynch, D.J.)
(same).  The regulations state that "[w]hen the evidence we
receive from your treating physician . . . or other medical

source is inadequate for us to determine whether you are dis-
abled, . . . [w]e will first recontact your treating physician
. . . or other medical source to determine whether the additional
information we need is readily available."  20 C.F.R. §
404.1512(e); see also Perez v. Chater, supra, 77 F.3d at 47.
Where the ALJ has failed to develop the record adequately, remand
to the Commissioner for further development is appropriate.  See
Pratts v. Chater, supra, 94 F.3d at 39.

   B.   The ALJ's Decision

        The ALJ first noted that plaintiff met the insured
status requirements of the Social Security Act through June 30,
2005 (Tr. 18).  The ALJ then applied the five-step analysis
described above, relying on the medical evidence and plaintiff's
testimony to determine that plaintiff was not disabled (Tr. 18-
24).

        At step one, the ALJ found that plaintiff had not
engaged in substantial gainful activity since March 9, 2005, the
alleged onset date of his disability (Tr. 18).

        At step two, the ALJ found that plaintiff had a severe
impairment due to his ankle fracture (Tr. 18).  The ALJ noted
that plaintiff sustained an injury to his left lower extremity

43

and was diagnosed with a left lateral malleolar fracture (Tr. 18).

At step three, the ALJ found that none of plaintiff's physical or mental impairments, either singly or in combination, were severe enough to meet or medically equal the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 19).

At step four, the ALJ found that plaintiff had the RFC "to lift, carry, push or pull ten pounds occasionally and less than ten pounds frequently" (Tr. 19).  The ALJ found that "[h]e can stand and/or walk for two hours in an eight hour workday with normal breaks and sit for six hours in an eight hour workday" (Tr. 19).

In making this decision, the ALJ noted that he consid-ered all symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence, including opinion evidence (Tr. 19).  The ALJ described the two-step process for determining whether there is an underlying medically determinable physical or mental impair-ment that could reasonably be expected to produce plaintiff's symptoms (Tr. 19).  If such an impairment exists, the ALJ must evaluate the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities" (Tr. 19).

44

The ALJ, therefore, had to make a credibility finding when plaintiff's statements concerning his symptoms were not substantiated by objective medical evidence (Tr. 19).

To this end, the ALJ discussed plaintiff's contention that he felt he could not work due to the combination of his impairments (Tr. 20).  The ALJ noted that plaintiff only required braces for his injuries, and that he testified that he had "healed the rest of the way in jail" (Tr. 20).  The ALJ also noted plaintiff's statement that he has some trouble with his right ankle, which can be affected by the weather, and that, for a period of time, he could not straighten his arm, but he can mostly do so now (Tr. 20).  Finally, the ALJ took note that plaintiff is not currently receiving any medical treatment (Tr. 20).

These statements, as well as the evidence in the record, led the ALJ to conclude that, while plaintiff's impairments could produce these symptoms, his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (Tr. 20).  The ALJ found that "if the claimant's symptoms were of the degree alleged . . . the claimant would have undergone some form of follow up treatment for his condition" (Tr. 20).  The ALJ observed that plaintiff may have lacked the financial means to pay for such services, but stated

45

that "the claimant applied for appropriate paper work in order to have his casting paid for by the hospital" (Tr. 20). Thus, plaintiff knew how to access essential health care services notwithstanding his limited financial resources. Follow-up treatment would have bolstered plaintiff's credibility, as the ALJ stated, "[t]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reason [sic] for this failure" (Tr. 21). The ALJ also noted that plaintiff's ability to sell narcotics suggests that his symptoms "were not of the degree that would prevent the performance of work-related activities even if these activities are considered illegal" (Tr. 21).

The ALJ found that plaintiff's statements regarding his symptoms were further undermined when he broadly claimed that these symptoms were present constantly, but could not provide details regarding any precipitating factors (Tr. 21). The ALJ was also troubled by plaintiff's failure to provide dates of or describe the treatment that he received for his injuries (Tr. 21). The ALJ also emphasized that plaintiff only took Tylenol or Advil for his pain, did not go to physical therapy, and did not require surgical intervention of any kind (Tr. 21).

46

In addition, the ALJ found that there was nothing in
the record that documented treatment of plaintiff's reported
injuries to his right ankle and left arm (Tr. 21).  He noted that
"[r]equests for updated medical records show that the claimant
had not been seen since April 12, 2005" (Tr. 21).  He also noted
that, although plaintiff claimed to have problems with his left
ankle and right arm while at Ogdensburg Correctional Facility,
the corresponding records stated that he had no major medical
issues (Tr. 21).  The ALJ stated that "the existence of medically
determinable physical or mental impairments cannot be established
in the absence of objective medical abnormalities such as medical
signs and laboratory findings" which did not exist concerning the
right ankle and left arm injuries (Tr. 21).

The ALJ also found that plaintiff's stated limitations
on his ability to work were inconsistent with the abilities
demonstrated by his activities of daily living (Tr. 21).  Plain-
tiff reported that he was able to care for his children, perform
household and outdoor chores, prepare food, shop for groceries,
socialize, use the computer and play games with his children (Tr.
21).  Based on this evidence, as well as plaintiff's "sporadic
treatment and the lack of medical evidence to establish total
disability[,]" the ALJ found that plaintiff's allegations were
"not indicative of total disability but rather shows an ability

47

to engage in a wide range of activities in spite of his impairments" (Tr. 21).

The ALJ also weighed the respective opinions of several physicians. He noted that Dr. Maurer had provided plaintiff with a note stating that the plaintiff could return to full duty on May 12, 2005 (Tr. 21). While he did not rely on this as a conclusion concerning plaintiff's ability to work, the ALJ did give it careful consideration and noted that it was reflected in the functional capacity section of his report (Tr. 22).

The ALJ gave careful consideration to the opinion of Dr. Finegan and found that it should be accorded significant weight because it was based on an actual examination of the plaintiff (Tr. 22). He cited her findings that plaintiff was temporarily very limited in his ability to perform physical tasks and would be limited in weight bearing for two weeks following his May, 17, 2005 appointment (Tr. 22). He noted her prognosis that plaintiff would increasingly perform more activities and that he should return to normal activities within six to eight weeks of their appointment (Tr. 22). The ALJ also found that plaintiff's normal x-ray of the left leg was consistent with the statement from the nurse administrator at the Ogdensburg Correctional Facility "who reported that the claimant has no major issues at this time" (Tr. 22).

The ALJ similarly gave careful consideration to the opinion of the State Agency consultant who determined that plaintiff retained the ability to perform light work (Tr. 22). The ALJ stated "[i]n considering the medical evidence in a light most favorable to the claimant, I find it reasonable to reduce the residual functional capacity to sedentary work given his inability to ambulate on his left foot for [an] extended period of time," citing his use of crutches, inability to bear weight, and his use of a cane in May 2005 (Tr. 22). Based on these determinations, the ALJ found that, given his RFC determination, plaintiff was incapable of performing his past relevant work because "they were all performed at the light exertional level and required the performance of activities precluded by the residual functional capacity cited above" (Tr. 22).

Finally, the ALJ noted that plaintiff's medications would not interfere with his ability to perform sedentary work because he was advised to take over-the-counter medications such as Advil or Tylenol for discomfort (Tr. 22). He did not report any side effects that would have "interfered with his ability to perform work on a sustained basis" (Tr. 22).

At step five, the ALJ found that there were several jobs that existed in significant numbers in the national economy that plaintiff could perform given his RFC, age, education and

past work experience (Tr. 22-23).  The ALJ stated that plaintiff, at forty-one, was defined as a "younger individual" as of the alleged disability onset date (Tr. 22), that he had at least a high school education and is able to communicate in English (Tr. 23).  The ALJ considered these factors in conjunction with the Medical-Vocational Guidelines and determined that a finding of "not disabled" was necessary (Tr. 23).  He concluded that plain-tiff had not been under a disability, as defined by the Social Security Act, from March 9, 2005 through the date of the ALJ's decision (Tr. 23).

      C.  Analysis of the
         <u>ALJ's Decision</u>

      1.  <u>Legal Error</u>

     As noted above, the first inquiry in a district court's review of a decision by the Commissioner is whether the Commis-sioner applied the correct legal principles in his determination. <u>Tejada v. Apfel</u>, <u>supra</u>, 167 F.3d at 773; <u>Johnson v. Bowen</u>, <u>supra</u>, 817 F.2d at 985; <u>Ellington v. Astrue</u>, <u>supra</u>, 641 F. Supp. 2d at 327-28; <u>Santiago v. Barnhart</u>, <u>supra</u>, 441 F. Supp. 2d at 625.  The Commissioner concedes that a legal error occurred because the ALJ

did not fully develop the administrative record (Def's Mem. in Support at 7).

As noted in Section III.A.4, the ALJ has an affirmative obligation to develop the administrative record, whether or not the plaintiff was represented by counsel at the hearing.  See Halloran v. Barnhart, supra, 362 F.3d at 31; Shaw v. Chater, supra, 221 F.3d at 131; Rosa v. Callahan, supra, 168 F.3d at 79; Tejada v. Apfel, supra, 167 F.3d at 774; Pratts v. Chater, supra, 94 F.3d at 37; Echevarria v. Sec'y of Health & Human Servs., supra, 685 F.2d at 755.  The ALJ has a "heightened duty" to develop the record when the claimant appears pro se.  See Echevarria v. Sec'y of Health & Human Servs., supra, 685 F.2d at 755; see also Bucci v. Apfel, 98 Civ. 2372 (RWS), 1999 WL 553787 at *5 n.5 (S.D.N.Y. July 29, 1999) (Sweet, D.J.); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990).

"'Where there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" a remand to the Commissioner for further development of the evidence and proper application of the correct legal standards is required.  La Patra v. Barnhart, 402 F. Supp. 2d 429, 431 (W.D.N.Y. 2005), citing Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996), quoting Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980); see also Rosa v. Callahan, 168 F.3d 72, 83 (2d Cir. 1999).  "A case seeking

judicial review of the Commissioner's adverse decision may be remanded pursuant only to sentence four or six of § 405(g)." Hunter v. Astrue, No. 4:10cv0161 TCM, 2010 WL 2880176 at *1 (E.D.Mo. July 19, 2010), citing Shalala v. Schaefer, 509 U.S. 292, 296 (1993) and Melkonyan v. Sullivan, 501 U.S. 89, 97-98 (1991).  Here, the Commissioner relies on sentence four which "'by its terms, authorizes a court to enter a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing.'"  Hunter v. Astrue, supra, 2010 WL 2880176 at *1, quoting Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) (internal quotations omitted).

      a.  The ALJ's Development
          of the Medical Record

      The Commissioner admits that it is "unclear" whether the ALJ sought all relevant records from plaintiff's treatment at Kingston Hospital (Def's Mem. in Support at 7).  The Commissioner further notes that "plaintiff provided evidence to the Appeals Council showing that he was treated at Kingston Hospital in June and July 2005, for a right ankle fracture, a scalp laceration, and puncture wounds, which was not part of the record when the ALJ decided this case" (Def's Mem. in Support at 7-8).  Indeed,

the ALJ stated in his opinion that he only found documentation to support plaintiff's allegations of injury to his left ankle (Tr. 21).  He attempted to obtain medical records regarding plaintiff's additional injuries and learned that he had not been treated since April 12, 2005 (Tr. 21).  However, the record indicates that the ALJ only contacted Benedictine Hospital Orthopedic Clinic in pursuit of these records, and failed to contact Kingston Hospital (Tr. 152; Def's Mem. in Support at 7).

The record, as well as plaintiff's submissions to the Appeals Council, indicates that the ALJ erred in failing to obtain additional records from Kingston Hospital.  Plaintiff testified to injuries to his left arm, right ankle and head at the ALJ hearing (Tr. 194-95, 197-98), and described his back injury in his "Disability Report - Appeal" form report (Tr. 96-98).  Plaintiff also testified at the hearing that he was treated for these injuries at Kingston Hospital (Tr. 195-97, 200).  According to the record, there was no evidence in the file regarding plaintiff's treatment for these injuries at the time of the hearing.

Moreover, when the hearing first began plaintiff emphasized his concern that the ALJ did not have all relevant medical records (Tr. 183-85).  In response, the ALJ very generally discussed the records that were currently in the file, but

did not provide the dates on the records he had from Kingston Hospital, nor the injuries described therein. This description denied plaintiff the opportunity to determine whether certain records were missing (Tr. 184). Plaintiff's incarceration further prevented him from personally ensuring that all relevant medical records were provided to the ALJ. Had the ALJ contacted Kingston Hospital, he likely would have received plaintiff's medical records from June and July 2005 which may substantiate, at least to some degree, that plaintiff did, in fact, receive treatment for these additional alleged injuries (Tr. 160-77).

While these records do not clearly indicate whether or not plaintiff should have been deemed disabled, they do alter the basis for the ALJ's analysis. The ALJ noted that "the existence of a medically determinable physical and mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings . . . under no circumstances may the existence of an impairment be established on the basis of symp-toms alone" (Tr. 21). Because he only had records of plaintiff's left ankle injury, the ALJ found that plaintiff's right ankle and left arm injuries were not substantiated (Tr. 21). In reaching this decision, the ALJ did not address plaintiff's allegations of injuries to his head and back at all. These significant gaps in the administrative record must be addressed on remand where the

54

ALJ should review plaintiff's submissions to the Appeals Council.[36]  See La Patra v. Barnhart, supra, 402 F. Supp. 2d at 431, citing Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).  The ALJ should then "weigh this treating source opinion in accordance with 20 C.F.R. § 404.1527(d), and reevaluate plaintiff's non-exertional limitations."  La Patra v. Barnhart, supra, 402 F. Supp. 2d at 431-32.

Plaintiff has not formally opposed the Commissioner's motion for a remand.  In plaintiff's letter to me, dated July 31, 2008, plaintiff stated that he was in receipt of defendant's request for "voluntary remand" but would not consent "in light of the fact that the defendant had all the relevant medical documentation in their [sic] possession all along and denied this fact throughout . . . the entire administrative appeal process" and asked that the Court retain jurisdiction in the event of a remand (Letter of Robert Henderson to Magistrate Judge Henry Pitman, dated July 31, 2008, (undocketed) at 1-2).  However, plaintiff filed no formal opposition to the Commissioner's motion, and his complaint requested, in the alternative to a reversal of the

---

[36]It seems that plaintiff submitted additional medical records with his complaint that were not included in his submissions to the Appeals Council (See July 2005 records from Kingston Hospital, attached to Compl. as Ex. F and Ex. G).  These records should be considered on remand as well.

ALJ's decision, that I "remand to the Commissioner for reconsid-
eration of the evidence" (Compl. at 3-4).  I, therefore, recom-
mend that this matter be remanded for the purpose of developing
the record regarding the plaintiff's injuries to his left arm,
right ankle, head and back in June and July 2005.

### 2.  Substantial Evidence

        Plaintiff argues that the decision of the ALJ "was not
supported by substantial evidence on the record, or contrary to
the law" because "the only portion of the medical record noted
was for a [l]eft ankle fracture" (Compl. ¶ 8).  Because I find
legal error requiring remand, I need not consider whether the
ALJ's decision was otherwise supported by substantial evidence.
See Johnson v. Bowen, supra, 817 F.2d at 986; Ellington v.
Astrue, supra, 641 F. Supp. 2d at 328.

### IV.  Conclusion

        Accordingly, for all the foregoing reasons, plaintiff's
motion for judgment on the pleadings is denied and the Commis-
sioner's motion to remand is granted.  The matter shall be

56

remanded to the ALJ for further administrative proceedings

consistent with this Order.


Dated:  New York, New York
        January 19, 2011

                              SO ORDERED,



                              _____
                              HENRY PITMAN
                              United States Magistrate Judge


Copies mailed to:

Mr. Robert Henderson
82 Pine Street
Poughkeepsie, New York 12601

John E. Gura, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007